## HUNT, HELM, FERRIS & CO. v. C. A. LIBBEY CO.

(Circuit Court of Appeals, Seventh Circuit.   July 20, 1922.)

No. 3092.

1. **Patents ⊚⟾328—1,160,589, for a stall construction, held not infringed.**
  The Ferris patent, No. 1,160,589, for a stall construction, covering a device for fastening cow stanchions to the cement base or curb, *held* not infringed.

2. **Patents ⊚⟾328—1,172,236, for an animal stall, held not infringed.**
  The Ferris patent, No. 1,172,236, for an animal stall, covering means for adjusting the effective length of stalls with reference to the gutter at the rear, *held* not infringed.

3. **Patents ⊚⟾101—Claims held to contain insufficient description.**
  Claims in a patent which describe a "means" only as for "quickly adjusting," or as "quickly releasable," do not describe a mechanical structure.

4. **Patents ⊚⟾328—1,160,588, for cattle watering device, held void for lack of invention.**
  The Ferris patent, No. 1,160,588, for a cattle watering device, *held* void for lack of invention.

Appeal from the District Court of the United States for the Eastern District of Wisconsin.

Suit in equity by Hunt, Helm, Ferris & Co. against the C. A. Libbey Company. Decree for defendant, and complainants appeal. Affirmed.

Russell Wiles, of Chicago, Ill., for appellants.

Arthur L. Morsell, of Milwaukee, Wis., for appellee.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

EVAN A. EVANS, Circuit Judge. Appellants on this appeal ask our consideration of three patents covering cow barn appliances, all of which were held by the district court invalid or noninfringed.

[1] Patent No. 1,160,589, to Ferris, covering a "stall construction," deals with a device for fastening cow stanchions to the cement base or curb. Claim 1, being typical, reads as follows:

"The combination, in barn equipment, of the stall frame members of a series of stalls, a curb of a length equal to that of the series, each of said frame members having at its lower end curb-engaging devices embracing the upper portion of the curb, whereby the stall frame members can be readily adjusted to various positions along the length thereof."

To borrow Ferris' language:

"It has heretofore been the practice to secure these stalls thereto (to the cement base) by anchors set in the curb, during the building thereof. The setting of these anchors has involved nice positioning in the masonry, the use of carefully prepared templets, and in addition has required that the entire stall arrangement be carefully planned for in advance of the performing of the concrete work in the barn. My present arrangement is designed to obviate these difficulties. * * * The curb-engaging members are adjusted to the desired positions, small notches to receive the inwardly turned tips being chipped in the face of the curb, and the bolts are tightened up. This affords a firm and satisfactory anchor to which the vertical members of the stall frame can be readily attached."

Appellee's structure differs materially from that disclosed in the patent. The stall frame support is adapted to be set into the curbing when the cement is poured and "sets" therein. But, when thus "set," appellee's structure does not permit of the ready removal of the vertical members of the stall frame for longitudinal adjustment. In fact, the only removals contemplated for appellee's structure are limited to instances where the entire frame is taken out of the cement base to be placed into a new curbing—a new setting of cement into which it, as an entirety, must become a part. We fail to find any support for appellant's claim that infringement is shown.

[2] Patent No. 1,172,236, to Ferris, covers an "animal stall," but it is in reality limited to "adjusting means," so as to "adjust the effective length of stalls, so as to align the cattle with the gutters at the rear of the stalls."

The District Judge covered the entire matter so fully and so well that we set forth his opinion in full and adopt it:

"With the patents in evidence, and the assurance of counsel on both sides that many others might be cited, it may be confidently observed that the animal stall, the stanchion, the adjustable stanchion, in fact, the barn equipment arts, had not been ignored prior to the advent of the patent in suit, February 15, 1916. The patents in evidence—Exhibits 28 to 36—cited in connection with this particular patent illustrate the extent to which workers in the art, in applying for patents, are quick to appropriate language of their predecessors descriptive of their objects or the situations wherein an invention may be utilized, and also strangely repugnant observations respecting, for example, the habits of animals—in this case, the cow. Thus, upon the hearing, in a comparison of the patented and the defendant's structure in this suit, the defendant urged that its structure was not operable as a practical matter with the cow in the stall because of the probable recalcitrant refusal of the cow to turn its neck to the right or to the left with the stanchion when it is being operated; whereas, the plaintiff, in seeking to refute this suggestion, urged that with its device, which did not turn in its operation, but was adjusted merely longitudinally, a cow, if it should happen to have its neck turned to the right or to the left, would readily respond to the requirements of the situation, and willingly place its head and neck in exact alignment with the proposed movement of the stanchion. So, too, the plaintiff urged that an advance had been made because of the greater adaptability to use of its stanchion for large herds, dispensing with his necessity of training the members to return to given stalls assigned to them respectively, because they might enter indiscriminately, and, assuming that they did, a readjustment of the stanchion would be promptly seen to by courteous bovine ushers constituting a part of modern barn organization. Indeed, in the patent in suit, the inventor seems to claim that the instantaneity of operation of his device dispenses not only with the necessity of training, but that it tends also to overcome any natural propensity found in the animal kind to return to an accustomed fold, and, further, to bring about a uniformity in length of the cows themselves, thereby dispensing ultimately with the necessity of any readjustment through any device; for it is said: 'With my improved device, where the adjustment is instantaneous, the animals enter the stalls indiscriminately, and in practice it is found that only a relatively small percentage of a given herd requires adjustment.'

"It is not necessary, at this point, to refer to the detailed specifications for construction, because they will appear sufficiently clear upon later reference to the art. The claims are:

"(1) 'In combination, a series of stalls, each one of which is adapted to receive any one of the units of a herd indiscriminately, animal-holding devices for the several stalls, a gutter at the rear of the series, manually operated means for quickly adjusting the animal-holding devices longitudinally

of the stalls after the animal is in place therein, and for securing said animal-holding devices in adjusted position, whereby each of the units of the herd is aligned with the said gutter, irrespective of the length of said units.'

"(2) 'In combination, a stall provided with a gutter longitudinally guiding means centrally located in the front of the stall and bearing a fixed relation to the gutter, a stanchion carried by the guiding means and movable along the same, and stanchion-securing mechanism for securing the stanchion in fixed positions on the guiding means and manually and quickly releasable to permit the adjustment of the stanchion while an animal is held thereby.'

"(3) 'In combination, a stall provided with a gutter, a tubular guide, a stanchion, a stanchion-carrying member running in a slot in the guide, and means for locking the stanchion-carrying member in a variety of positions in the guide, and adapted to release and lock the same quickly to permit its adjustment while an animal is held thereby.'

[3] "Upon reference to the patents brought to the attention of the court, Exhibits 28 to 36, it appears, immediately, that not a single element is lacking in the art and that upon the broad wording (for example, of claim 1) a clear anticipation is found in some of the prior art structures, provided only they may in any fair sense be said to be 'quickly adjustable,' 'quickly releasable to permit adjustment,' or 'adapted to release and lock the same quickly to permit its adjustment while an animal is held thereby.' It is idle, upon cursory inspection only, to suggest that the combination of claim 1 is not found in the patent to Weber, 1,163,723. By this is meant that the patentee Ferris herein has failed to give to his 'means'—effective as 'quickly adjustable' or 'quickly releasable'—a definition which in a mechanical sense (unless limited to his precise disclosure) will distinguish his claims from either prior or possibly future structures in the art. Plainly, those words do not describe a mechanical structure. Weber's structure was undoubtedly 'quickly' adjustable 'or quickly releasable' as against one not so 'quick.' Identically true is this of Stillman. These two are referred to primarily because structurally each contains the means for longitudinal adjustment through manually operated means, guiding means, in one of these patents centrally, the other one not centrally, located; in the one tubular, and in the other not a tubular, guide, but in all in a combination with stalls animal-holding devices, a gutter at the rear of the series of the stalls, all of them in a fixed relation to such gutter and operable to align the animals. Plainly, whether they operate or are releasable 'quickly' involves a comparison of discharge of functions in point of time, and, as observed, Weber and Stillman may readily respond to that characterization when put up against other structures functioning less 'quickly.'

"In a broad and in a true sense, Ferris may be distinguishable from Stillman and Weber, in that he introduces a mechanism to be operated upon different manual exertion. But it is equally true that claims in the use of broad language such as 'quick,' 'quickly releasable,' and the like, do not describe a structure. They describe the results of comparison of one structure in its operation in point of time as against another structure. I am speaking now particularly of claims 1 and 2, which make no attempt to describe a structure or means. Can it be said that a patentee describing a function or means, or merely the carrying out his idea, by language having the purport indicated, thereby gains a monopoly of every conceivable construction which in respect of a time element may respond to such language? The Weber structure, clearly one for manual operation and adjustment, containing even the specific tubular guide, is readily open to transformation by adoption of variety of means quickly releasable. Therefore, granting that Ferris in his specific disclosure made a novel advance over Weber, should he, through disclosure of a single one of limitless possible conceptions, and by use of nonmechanical language descriptive merely of relative rapidity of function, be allowed to appropriate a conception so radically different as is found in the defendant's structure? Let it be viewed from another angle. Ferris could well concede that Stillman and Weber had 'quickly releasable' or 'quickly locking,' or 'quickly adjustable' mechanisms when viewed in the light of their predecessors. He seemed to think that any mechanism which dispensed with the use of wrenches, bolts,

etc., was also 'quickly releasable,' 'quickly locked,' or 'quickly adjustable.' But he disclosed a single structure, a singe conception, embodying his advance.

"The most cursory comparison of Ferris' and the defendant's structure, discloses their fundamental differences. No matter how variant, how great the advance in ingenuity, the plaintiff here seeks to claim infringement merely because Ferris' and defendant's structures are both 'quick' in their operation. Therefore, while the defendant's structure adjusts or releases or locks 'quickly,' and has nothing of true mechanical equivalency in it, yet it is sought to subject it to the principles of equivalency, solely because, like plaintiff's, its functioning, as noted, may be said to be 'quick.' It is conceded by the plaintiff that, though in the defendant's operation five steps are taken as against three in the plaintiff's, the former has distinct advantages from a practical and mechanical point of view. Now, under these circumstances can it be said that Ferris got a patent coextensive with the almost illimitable field for developing 'quick adjustment,' and that he may henceforth not only dominate, but exclusively possess, the art as it was left by Stillman and Weber?

"As further illustrative of the thought before expressed, an interesting comparison may be made between Ferris's claims 1 and 2, on the one hand, and 4, on the other. In 3 and 4, which, I assume, are professedly narrower claims, the particular structure found in the specifications is attempted to be described. Therefore—as to claim 4—no pretense of infringement can arise. But, as above indicated, claims 1 and 2 describe no means, but profess to include every conceivable means, provided only that, upon some standards, which likewise are not disclosed, the mechanism must be 'quick.' I am satisfied that upon no theory or interpretation can his claims be given such breadth; that on the contrary, his structure must be limited to his plain disclosure and description of a specific structure, and whatever equivalency may attend, it does not comprehend a structure which, like defendant's, presents fundamental difference in mechanical principles resulting in a fundamentally improved structure."

[4] Patent No. 1,160,588, to Ferris, covering a "cattle watering device," is challenged for want of patentable novelty. Claim 1 reads:

"A device of the character described comprising a vertically extending water pipe adapted to be connected at either of its ends with a source of supply, a bowl carried by the water pipe and mounted exteriorly thereof, means on the water pipe for supporting the bowl thereon, a waterway from the interior of the pipe adapted to deliver water into the bowl, a valve in said waterway, and a valve-operating member extending from the waterway into the bowl and so positioned as to engage the muzzle of an animal drinking from the bowl."

Appellants have narrowed the issue greatly by a frank and full concession, which eliminates any necessity of referring to prior patents with which the art abounds. They say:

"It is exceedingly old to build an animal watering device in which there is a bowl in which the animal sticks its nose, and in which bowl is mounted a grill, grating, or projection which is struck by the animal's nose, and which in turn operates a valve, so as to turn on the water and fill the bowl. Water thus flows in the bowl when the animal is drinking, and it is turned off when the animal is not drinking. The idea is illustrated in the Gilbert patent, applied for in 1884, and in the succeeding patents to Speicher, Yont, Anderson, Howart, and Cheevers, and in the French patent to Bauduin. All of these devices consist broadly of the same elements, the bowl and water supply, a valve and a valve-operating member within the bowl, adapted to be engaged by the nose of the animal in seeking water."

With equal clearness counsel for appellants has described Ferris' contribution. He says:

"Having removed the pipe from the bowl and used it to support the bowl, it became necessary to bring the water over into the bowl, and thus a new

element was added, the waterway or nozzle, which runs over from the vertical pipe to the interior of the bowl. This having been done, a valve had be set in this waterway, and the usual animal operated device had to be provided."

An elaborate and ingenious argument is advanced in favor of this patent, wherein we are asked to ignore the teachings of the plumbing art, and to assume that the inventor working in the cow stanchion art was ignorant of what had occurred in other mechanical fields, and that his skill and knowledge alone defines the standard by which we must determine the difference between inventive genius and mechanical skill.

We conclude that the teachings of the plumbing art were before Ferris when he constructed his water bowl, and that his bowl failed to rise to the dignity of invention.

The decree is affirmed.